MEMORANDUM OF DECISION
This is an action for the termination of parental rights of Shannon C., aged twenty four, and Kevin C., aged twenty-five, the biological parents of the minor child, James C., born July 23, 1994. Thus child has previously been found to be a neglected child on July 13, 1995 (Mulcahy, J.) The parents appeared personally and through court appointed counsel. Each vigorously contested the allegations of the petition filed by the Commissioner of the Department of Children and Families ("DCF"). CT Page 553 The trial occurred over two days. The court heard from DCF social workers, the child's foster parents, two clinical psychologists, the paternal grandmother, a brother of the respondent mother, and other persons. The court received into evidence social studies, court approved expectations signed by the parents, photographs, and two reports of the court appointed psychologist, David M. Mantell, Ph.D.
The court makes the following findings by clear and convincing evidence. The sociological history of the parents was presented in the form of testimony of the social workers and the social study (Exhibit 1). This social history was not challenged by the parents. They married within the month the child was born. They separated five months later. They have one child of their relationship, James. This child was removed from them on February 15, 1995, after the mother brought the child to the hospital with multiple bruises about the head and buttocks. The four explanations offered by the mother for the bruises were not consistent with the injuries the child endured, according to the physician's assistant who examined the child. The child was less than seven months old at the time.
The child's mother had stated that the child "is angry inside and has a bad temper." Before the child was born she had wanted to give the child up for adoption. The father would not agree. After the child was born, she again expressed an interest in giving the child up for adoption. She admitted that she was overwhelmed parenting the child. At the same time she was having problems with the child's father who had monumental anger management problems, had been abusive to her and had shaken the baby in anger. Shannon separated from Kevin, obtained a domestic violence protective order and sought shelter at a battered women's shelter on November 22, 1995.
Shannon left the shelter after one day for a rules violation, and she went to live with her brother for a month and a half She thereafter moved, in late January or early February, 1995, into a Super 8 Motel with a new boyfriend. The boyfriend did not like the child, did not get along with Shannon's husband and, Shannon later admitted, her boyfriend had struck the child. Even after the child was hospitalized and removed from her care, Shannon stayed with this man and became pregnant by him. She had a child by him who is now in DCF care.
At the time James was first committed, each parent signed a CT Page 554 document calling for them to perform certain "Expectations" in order for them to "improve your chances of regaining . . . guardianship of your child permanently."(Exhibits 7 and 8). Neither parent satisfactorily complied with the court approved expectations. The social workers offered appropriate, available and accessible services for treating the father's anger management problems, for counseling, and for parental skills training. Neither parent fully attended or successfully completed the offered programs. Shannon would dutifully begin the programs but was inconsistent and sporadic in her attendance, usually resulting in a dismissal from the counseling or program services.
Most importantly, neither parent has a psychological profile which suggests that he or she is capable of caring for this child. Dr. David Mantell, the court appointed evaluator, saw both parents approximately six weeks after the child was removed from their custody. Kevin, the father, had such an explosive temper, that Dr. Mantell felt it necessary to remove other patients and clients from his waiting room because of the display of temper by Kevin. He didn't want to complete the Minnesota Multiphasic Inventory (MMPI) so he just threw it.
Kevin indicated that he had repeated the ninth grade three times before he left school. He had several arrests for breaking and entering, larceny, and Breach of the Peace. He had been incarcerated on at least one occasion for six and a half months. Dr. Mantell was of the impression that Kevin was a very disturbed person, with a history of antisocial behavior, unable to govern his behavior, and was cruel to others. He has a history of alcohol abuse and his likely diagnosis was intermittent explosive personality disorder or antisocial personality disorder.
In terms of everyday life, Kevin's disorder scares people and generates a high level of irritability and anger. He can't parent because children are inherently frustrating. He does not have any insight into his problem, he doesn't acknowledge his problem, refuses to get treatment, and is a threat to any child, according to Dr. Mantell.
Confirming this diagnosis was Shannon's impression of Kevin as a father. Shannon had told the social worker that Kevin was drinking and not coming home and he was screaming at the baby and shaking the baby. He didn't have the patience to be a parent and frequently was given to anger and for those reasons they had separated. CT Page 555
Dr Robert Neems evaluated Kevin for the possibility of supervised visitation. Dr. Neems concluded that Kevin had significant problems with his temper that had caused problems in his life and had caused his son to be afraid of him. He recommended to Kevin that he seek psychiatric evaluation for treatment and medication which might have beneficial results on his temper. Untreated, Kevin posed a risk to his son for visitation.
With respect to the mother, Shannon, she posed a different set of problems. Shannon had an unusually disrupted childhood, and a pattern of residential transience, a childhood of emotional, and physical victimization by her mother, and sexual victimization by an older brother. She believed her mother had a multiple personality disorder or schizophrenia.
Several features make her a poor prospect to parent, according to Dr. Mantell. First, her own ambivalence about parenthood she wanted to give the child up for adoption, feeling that neither she not her husband was capable of caring for a child. Secondly, after the couple separated she left the child with Kevin for five to seven days, re-exposing the child to the explosive father, which exhibited very poor judgment and, thirdly, because of the inadequately explained physical injuries. Furthermore, Shannon resumed a relationship with a man who dislikes, and probably, abused the child.
Three years have elapsed since the child was placed in foster care and neither parent has made substantial gains in personal or parental rehabilitation.
In Dr. Mantell's report of June, 1997, (Petitioner's Exhibit #9) he concludes in his summary,
 The mother and the father are both immature, unprepared for adulthood, and uninsightful about the impact of their behavior upon their child. Neither of them takes responsibility for the child's impaired and damaged condition. The father presents with significant judgmental and psychological difficulty indicating a history of learning disability and also an explosive personality disorder. The mother presents with immaturity, transient relationships, and reports a significantly impairing history of emotional, physical and sexual abuse during childhood and also of rejection. CT Page 556
 Adjudication
With respect to the statutory grounds for termination of parental rights of the mother, Shannon C., and the father, Kevin C., the court finds by clear and convincing evidence that the child has previously been adjudicated neglected on July 13, 1995, and the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes 17a-112(c)(3)(B)
The court finds that these grounds have existed for more than one year.
The court makes the following factual findings required by 17a-112(e):
1) Appropriate and timely services were provided by the Department of Children and Families, including Title XIX, Parent aids, Casework services, psychological evaluation, individual counseling, transportation assistance, and visitation coordination.
2) The court funds by clear and convincing evidence that the Department of Children and Families made reasonable efforts to reunify the family, given the situation and circumstances, as far as possible. The court finds in this proceeding that the father was unable, due to his failure to recognize or appreciate his psychological problems and his lack of personal initiative, to benefit from reunification efforts. Mother's inability or unwillingness to address her multitude of personal problems, has prevented successful reunification efforts. DCF made efforts to reunify by increasing the hours of visitation but mother was not consistent in her attendance. Mother was unable to react appropriately to the child's needs and the child reacted negatively, emotionally and physically, to the extended visitation. Father's visitation was ended due to the child's noxious response to the presence of the father. The child was exposed to repetitive hostile conduct by the parents, both physically and emotionally, which conditioned this child to fear his own parents, according to Dr. Mantell. This was not a diffused and generalized fear of all adults, only of his parents. In the foster home this child has flourished to a normal, sunny, joyous child. CT Page 557
3) The Department, with the approval of the Court, set reasonable and realistic expectations in order to reunify the family. There was only marginal compliance or participation by the parents. The parents have failed to complete recommended treatment and programs
4) The child has strong emotional ties with the foster family who has provided the physical, emotional and educational support this child needs. The child has no positive emotional ties to the biological parents. The child had demonstrated little more than a visiting relationship with mother, not a parental relationship.
5) Finding regarding the age of the child. James is three and a half years old. He has been in foster care for almost three years. He deserves a permanent, structured caring, nurturing environment that the foster parents are willing to permanently provide. Neither parent can offer the child a secure home at any time in the foreseeable future.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions etc. The parents have not made realistic and sustained efforts to conform their conduct to acceptable parental standards. Mother requires extensive therapy to deal with her parental failings. Father has failed to take the recommendations of Dr. Neems that he obtain medication to minimize his explosive temper and participate in any parental programs offered for his personal rehabilitation. . . Giving them additional time would not likely bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. In re Luis C.210 Conn. 157 (1989); In re Juvenile Appeal 183 Conn. 11, 15 (1981).
7) Finding regarding the prevention of the parents from having a meaningful relationship etc. The Department initially attempted to encourage contact. Visitation with father was discontinued upon the child's robust negative reaction to his presence. DCF tried increasing visitation for the mother without success to mother or child. No unreasonable conduct is noted. The mother has had regular visitation with the child but was very inconsistent in exercising her visitation. Visitation was subsequently ended when it proved harmful to the child.
DISPOSITION
CT Page 558
The court finds that these grounds and circumstances have existed over an extended period of time which is greater than one year. The court finds, based upon the testimony and evidence presented, that it would be in the child's best interest to terminate the parental rights of Shannon and Kevin at this time. This finding is made after considering the child's sense of time, his need for a secure and permanent environment, the relationship that the child has with his foster parents, and the totality of circumstances that the termination of parental rights is in the child's best interest. In re Juvenile Appeal (Anonymous), supra,177 Conn. at 667-68. See generally, J. Goldstein, A. Freud A. Solnit, Beyond the Best Interests of the Child 99 (1979). 
 Order
It is accordingly, ORDEREDthat the parental rights of Shannon C. and Kevin C. are hereby terminated. The Commissioner of the Department of Children and Families is hereby appointed the statutory parent. A permanency plan shall be submitted within 90 days. A review Plan for Terminated Child shall be filed in accordance with Federal Law.
Francis J. Foley, Presiding Judge